We have five cases before us today. One case has already been disposed of and handled on the briefs. So we have four cases for argument. The first case is Boomerang Tube LLC v. United States, 16-1554. Mr. Chagrin, I understand you're going to speak first. Am I correct? You're speaking for six minutes. You're going to reserve three minutes for rebuttal. And then, Mr. Cooper, you have four minutes, reserving two. Is that correct? Counselor Bond, you have 11 minutes. And Counselor Noonan, four minutes. Correct? All right. You may proceed, sir. Good morning, Your Honors. May it please this honorable court, I'm Roger Chagrin of Chagrin Associates on behalf of Plaintiff Appellants Boomerang et al. Our case comes down to one issue. Does DOC Regulation 351-401F and DOC's longstanding practice require that when the department finds transactions between affiliated companies, it must decide whether to collapse these affiliated companies or doesn't it? The government, in its brief to the court- The Commerce Department never made a decision on that issue. Is that correct? They did not. Did you ever argue that to the Commerce Department? We argued the affiliation issue as to similar affiliated companies that are collapsing issues doing the same things in transactions- But you never argued as to the Colombian data. That is correct. Even though you did make an argument as to why the Colombian data shouldn't be used. Yes, that is correct. Why isn't that a failure to exhaust? Because, Your Honor, this is one of the issues, as in the regulations, most of the issues that the department addresses in determining its dumping calculations that the department must do. So a party cannot fail to exhaust its remedy when the department has to do something. I don't understand that. The department has a lot of regulatory obligations to consider and a lot of statutory obligations to consider, and they do them and they think they've done them correctly. If you think they haven't, it's incumbent upon you, under the exhaustion statute and regulation, to raise that to them so that there can be a decision for them to make and then be reviewed by the CIT. Isn't that correct? No, with all due respect, Your Honor, we disagree. I think that if there's any statute or regulation out there that poses an obligation on commerce, you're allowed to raise it for the first time at the CIT. As the certain I do, yes. That can't be the exhaustion rule. Well, we believe that's what these courts have found, and in addition here, as the court recognized. Can you point to a decision from this court that says that? Well, normally you defer on exhaustion to the CIT. We don't defer to the CIT on exhaustion. We review it for abuse of discretion, but we don't defer to the legal articulation. Correct. It's an abuse of discretion. But it's not an abuse of discretion on their legal interpretation of the exhaustion rule. It seems to me, if your view is that as a matter of law, you can neglect to respond or neglect to raise an issue and raise it on the first time to the CIT, that that's an incorrect interpretation of basic exhaustion principles. Not just in these cases, but in administrative law as a whole. Well, and as the court below found here, the first time the Department of Commerce ever utilized any of these Columbian transactions for any use was in its final determination. But that's always going to be the case if they change their mind on a final determination. Are you saying that if commerce uses a different calculation they used in the initial determination, that you're free to raise any arguments whatsoever that you may not have known about because the other party raised them, but you just chose not to? Well, I think that is the case. And in this particular circumstance, for example, What support is there for that that's a correct legal interpretation of an exhaustion rule? I believe that, and we can further refer you to analysis, that for issues that the department must make, I mean, there's a whole number of them. There's very few issues in the statute and regulations that require the parties to raise those issues in the department. There are myriad issues, which is why we have a several hundred page final decision here that the department must make, or else they're not doing dumping calculations. And we think it's common for issues to be raised. And I guess your argument is that you did not have an opportunity to address this particular issue. That is correct, Your Honor. But the data was on the record. The data was placed on the record. In thousands of pages of data, this data was placed on the record. Right, but you're looking at establishing constructive value for profit, and you have profit data on the record. Why did you not respond to that or at least raise that or see it or foresee that knowing that Congress can switch between a preliminary and a final determination and say, I'm going to, at minimum, object to this for the following reasons. We're alert, Congress, to the need to collapse. Your Honor, there were a number of alternatives for profits. There weren't that many, though. This is not a case where there were hundreds and hundreds of data sets that could be used. There was no more than six or seven countries or things, right? That's correct. And this isn't a case where Congress plucked this data without notice from anybody's argument. I mean the other side specifically argued to use this data. You specifically argued against it. You just didn't come up with the argument you have now that you made for the first time to the CIT. Are you saying that argument wasn't available to you when you made your response in your rebuttal brief? Not that it was unavailable, but this was one phrase in a 67-page brief, and, in fact, counsel for the Saudis did not even say one word about this issue at the hearing, nor did the department, so this came out of the blue. You agree that the issue is raised, though, by your adversary, correct? We agree that there was a phrase in their 67-page brief with this issue. Which you responded to. I mean, how can you say it came out of the blue when you specifically made a response and said you can't use this data? If you're going to argue against the use of the data, aren't you obliged to tell Commerce all the reasons that you can't use the data? With all due respect, Your Honor, no, we don't believe so. We believe that. I don't understand. Please don't talk over me. I don't understand how that's a correct legal articulation of basic exhaustion principles. If you're on notice that a certain decision and certain evidence may be relied on and you have an opportunity to address all arguments why it shouldn't be relied on and you fail, you have failed to exhaust. I want to talk to you about the statute 28 U.S.C. Section 2637D. It says that the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies. So the shall seems to make a requirement, and they have to do it. How do you interpret where appropriate? We believe, as a reviewing court, you have to find that they abused their discretion. They did have to make this decision. The court did make this decision based on the record, and as I just told Judge Hughes, they said, look, there was no due process for the parties because the department never gave the parties an opportunity to raise all these issues because the first time they took this action was in their families. I really don't understand. That is what they argue. Now today you're arguing something a little different, though. I shouldn't say they argued. The CIT held that was the basis for the CIT's decision. But what I hear from you is something a little different. It sounds like you're saying there was no exhaustion of remedies because this is something commerce should have done anyway. That is correct. So that's a different rationale than the CIT's rationale. That is correct. We agree with the CIT's rationale, but we do believe that. But the CIT's rationale would mean that every time commerce comes up with a different methodology in its final determination, that the exhaustion requirement goes out the window because they've always come up with a new methodology that is after the briefing that you haven't specifically been given an opportunity to respond to. Hopefully not every time. This was the issue that decided whether this would be an affirmative or negative determination. I don't understand how we could cabin that. If you're allowed to not raise arguments when you're on notice that that data might be used and sit on your hands, and then after the commerce actually uses that data, say, oh, we have this new argument that we could have raised, but we didn't. That doesn't seem to me to be a proper legal articulation of exhaustion principles. And if that's the legal articulation, I don't even think we have to get to abuse of discretion. I think it's an incorrect statement of general legal exhaustion principles, which the statute clearly incorporates. I'll save the rest of it for Mike. Thank you very much. We'll restore your time, Counselor. Good morning, Your Honors. There are three key points I'd like to get to about why remand is required here, and then I'd also like to address the exhaustion point that Judge Hughes has raised. Let me point out what my concern with the exhaustion situation is. If data is submitted by a respondent in a proceeding, it seems to me that the parties can get that data and review it and run their numbers and actually come out with their own estimate as to what a potential dumping margin could be generated by those numbers. And if we're in a situation where parties can do that, and they do do that, in the course of an investigation, and then say, well, we're not going to bring up this issue because this issue may lead down the path to a de minimis situation or low margin, then we'll focus instead here and not get into this. It really creates a situation where you have two bites at the apple, and by remaining silent, you benefit from knowing what the actual margin is, and then coming before the CIT and then this court and arguing that you should have gotten or that the other number should have been used. And I completely hear that concern, Your Honor. I can see you bringing up the other side of your argument if we were talking about the respondents having not exhausted their remedies for the same reasons that I stated. Yes, and I think the key way to cabin that concern and to address, I think, Judge Hughes' concerns is that the focus of the exhaustion doctrine should be on what the agency has given notice to the parties are the key issues. And so if the agency has not suggested that an issue is pertinent How can you say that the data for profits, which data to be used, was not the agency didn't give you notice? They specifically gave you notice. There were a lot of different inputs on the records. Your friends on the other side were arguing for the precise data that Commerce ended up using. I don't know what else that they have to do. If what you're saying is Commerce cannot change its mind from its preliminary determination to its final determination without giving you, as my colleague says, a second bite at the apple, well, that's not exhaustion principles. I mean, are you saying that you had no opportunity to respond to this argument raised by your friends on the other side? We are not saying that, Your Honor. Well, isn't that the basis of exhaustion doctrine? That if you have an opportunity, the argument is in play, and you fail to respond and raise all arguments in support of your position, you fail to exhaust. Isn't that basic administrative law? I would respectfully disagree. And what I would suggest, Your Honor, is if you think about Can you cite to me a case that says that? Certainly, Your Honor. So the CSX transportation case from the D.C. Circuit we cite in our brief 584 F. 3rd 1076. If you think about it in the larger administrative law context as you're doing it, the typical way agencies Can you cite to me a case from this court that says that? Well, so the typical way agencies deal with this or administrative law deals with this is the logical outgrowth rule, which is if the final determination is not a logical outgrowth of the notice of the proposal Sure, sure, I get that. If they come up with some wild new reason that no party is raised, they went to new data Well, it's not just that no party is raised. I mean, if you think about it in the rulemaking context, lots of commenters might suggest all sorts of things. And as an interested party, you don't have to comment on every other commenter. This isn't a case where there are thousands and thousands of commenters like a regular agency regulation rulemaking. This is a case where there are at most four or five parties. And you did respond to the arguments of your friends on the other side. I know you specifically decided not to file a rebuttal brief, but that doesn't get you out of exhaustion. Well, I would say there have been about a half dozen or so cases in the CIT where the CIT has specifically held that even when commenters, excuse me, even when parties to an anti-dumping proceeding have raised issues, the other side is entitled to rely on the preliminary determination, which is the agency's notification of what the relevant issues are. And then if the agency changes its mind at the final determination  This is a situation where the agency gave its initial determination and then both parties complained about the agency's determination and explained why different data should have been relied upon. So why isn't that enough notice? It's not a situation where the party's so fine that just we're okay with that determination and didn't contest it, and then commerce on its own went ahead and changed its mind in the final determination. Instead, this is a situation where both sides said we don't like your initial determination and explained why and gave alternatives, and then commerce adopted one of them. That's correct, Your Honor, but I think if you look at the actual proceedings before commerce, the suggestion of using this particular Columbian transaction was really an afterthought for everyone. What do you mean it was an afterthought? It was specifically in the briefs of at least one party opposing you. It was in the brief for about half a page when 40 other pages had been spent on... Is there a page-length requirement? It's a proportionality issue, Your Honor. I mean, if it was in a footnote, maybe you'd have an argument. But it's a proportionality issue, Your Honor, where if both sides spend 40 pages arguing about one option and then they spend half a page arguing about another option, and then at the hearing nobody even talks about it. Commerce doesn't ask questions about it. The other party doesn't raise it as an option. Let me ask you procedurally. If you think that you have to get notice, how would that even work in this system? I mean, commerce makes an initial determination. They get briefings or maybe a hearing. Then they issue a final determination. Do you think that every time commerce decides we may alter our initial determination, that they have to issue a new initial determination and allow for this to go forward all over again? Absolutely not, Your Honor. But what they do have to do is they have to do the required analysis and proceed at their own risk if they issue a final determination that adopts a new methodology that they haven't given notice to the parties to and they don't do the required analysis. Well, how would they get that notice? That's what I just asked you. Well, there are different ways. They could give notice, or if they do adopt a new methodology. We're not saying they can't. It's just then they would have to do all of the required analysis that goes along with that new methodology. That's all I'm suggesting. So basically you're saying if they changed the methodology from their initial to the final determination, they still have to issue another final determination after that fact? They do not have to, Your Honor. But they would have had to if they had done this collapsing analysis. So the result is that you're allowed to raise any argument whatsoever on review to the CIT? Certainly not any argument. Only important aspects of the issue that Commerce did not address when it adopted a new methodology without giving the parties notice of it. That's it. Thank you. You're well into your – I'm sorry. We have another question. Can I ask one more question? I want to ask you the same question I asked your colleague there. 20 U.S.C. Section 2637D says that the Court of International Trade shall where appropriate require the exhaustion of administrative remedies. How do you read the language where appropriate? Is it discretionary or is it just applying the rules saying where appropriate for sometimes it's not appropriate, for example, where there's surprise or futility? I would agree, Your Honor, that I think it's not appropriate where there is not notice to the parties from the agency of the methodology or issue that the agency is using or of the fact that the issue is something the agency is considering. But is it a legal determination or is it discretionary? I would say it's certainly not a purely legal determination. It does depend on the particular facts before the – in the agency proceeding has the agency – what does the agency signal to the parties are the key issues. And so that does require some consideration of the facts and you apply it in the law of the exhaustion doctrine to that factual record. Okay. Thank you. Thank you. May it please the Court. I'd like to start by addressing this notice contention head on. The argument that Commerce has to notify the parties of what Commerce will be addressing in the final decision is exactly contrary to how the process works and how Commerce has established the process. As Boomerang itself argues and concedes in its opening brief at page 17, Commerce's practice in its final decision is to address the arguments made by the interested parties. And we see that even in just how the final decision is structured. Commerce starts out with the arguments and it ticks through each one. And so given the regulation on comments and rebuttals, importantly rebuttals, it is the parties that tee up the arguments and develop them, develop both sides of them for Commerce to decide. In your view, is this argument adequately teed up? I mean your colleagues on the other side say that this is half a page, half a page or a page in a 47-page brief. Yes, Your Honor. It was squarely at play. At the latest, by the time the parties had the opportunity to file rebuttal briefs. The Columbia sales were placed on the record early in the proceedings when Commerce asked for third country data. Was there verification on that data? I'm not aware of whether there was verification on the data or not. But that hasn't been raised as a problem. And so the data were on the record. They were expressly raised in Jessica's case brief. And I do have a few sites for the court. I'll use the public data. They were raised not only as options for constructed value profit, but also at, for example, page 3521, 3487, and that section in Jessica's – oh, wait. Well, I'm not sure if that's what I remember. But Jessica raised these as a viability argument for Commerce to use to calculate normal value, and that was several pages in their brief. And then separately they raised this, for example, at page 6933 and 6934. So there's two pages, one and a half at least, discussing the option of using Jessica's own sales and using the Columbia sales specifically. And in Boomerang's rebuttal at 3617, they expressly acknowledged that Jessica has raised these arguments. So this is a quote. Jessica, quote, suggests that the department can use the profits on Jessica's sales to Columbia for CB profit. So this is Boomerang's own rebuttal brief. And then they raised certain arguments about that. So this was at issue. It was acknowledged to be at issue by Boomerang. Boomerang certainly didn't raise this issue. U.S. Steel filed no comments or rebuttal comments at all. And so one of U.S. Steel's arguments is that, well, actually parties don't have any incentive to intentionally withhold arguments from Commerce. That may be true or not, but the fact remains that they didn't raise this argument at Commerce, and whether that's because of an intentional omission, because of an afterthought, because of a change in strategy, on their part really doesn't matter. The point is that Commerce officials, interested parties, should not have to duplicate their efforts in this investigation simply because of an afterthought or an omission by certain parties. What about the abuse of discretion standard of review? I mean, how is there an abuse of discretion by the CIT below when it found that there was no exhaustion of revenues? There was an exhaustion, but I got it reversed. So the abuse of discretion happened here because the CIT's reasoning was legally erroneous, and to the extent they made any findings of fact, the finding of fact was basically simply because there was a change between the preliminary and the final decision. Therefore, automatically, plaintiffs had no opportunity to raise this issue to Commerce. I'm a little confused about that, too, about the way you briefed this, because I know we've said it's abuse of discretion in an individual case, but it seems to me that the proposition of whether new notice is required before Congress can change its position from an initial to a final determination is a legal question. It is not a discretionary question in each case. That seems to me, if the rule is that they always have to give new notice on issues of importance, then we have to determine if that's consistent with the statutory and regulatory scheme. And that we can answer de novo, right, as a matter of law. Precisely, Your Honor, yes, and that is we did raise that. And if we agree with you that they don't have to, then I think you just said, and I think you're probably right, that if it's an error of law underpinning the excuse of the exhaustion here, then it's an abuse of discretion. Yes, precisely, yes. If there is an error of law at the CIT, which there is, because their reasoning that parties can rely on the preliminary decision is completely wrong under this court's case law, including Korrestal. In Korrestal, the plaintiff sought to rely on the CIT's preliminary decision, which soundly rejected their argument. And this court said, no, you still have to follow the procedure of filing case briefs. What obligation does Congress have to provide any type of notice when it's going to change its methodology? Suppose that Commerce decides right after the preliminary determination it's going to change its methodology, rely on third country sales as opposed to some other methodology. Are they required to notify or should they notify at that point in time to the parties? Or is this case one where you're arguing that the switch happened at the very last minute and there was no time to notify? Well, I'll try to break down your question a bit. I think what happens in the normal course of a Commerce investigation or administrative review is that the preliminary decision is issued and then the parties have what is basically an adversarial process to raise problems that they see with the preliminary decision and then to rebut, importantly to rebut. What's at that point in time Commerce has already decided to make a switch but nobody knows about it? Well, hypothetically, I know there are cases where if Commerce may issue a letter to the parties saying, please submit additional data on this issue and that may provide notice to parties that Commerce is looking for additional options for a certain value. I don't think that happened here. Here Commerce did bring in additional constructed value information. So if it's the sort of thing where Commerce is requiring additional information, there will be notice to the parties because there will be communication between Commerce and the parties. But that's not what happened here. What happened here is that the parties teed up this issue about constructed value profit. Importantly, it was the plaintiffs, it was Boomerang that had a problem with the preliminary choice of Saudi steel. And so it's a little odd. They say they should be able to rely on the preliminary decision when they're the ones challenging it. So the parties teed up this issue for constructed value profit. There were six or seven options. And so this was the adversarial process. And then at the end Commerce weighed them all and concluded that the best option was the Columbia sales. Do you think hypothetically if we had a different case where there was a huge record and there was lots of different data that could support more than one methodology and the initial determination Commerce used one methodology relying on one set of data, all the briefing was on that methodology and a limited set of data. If Commerce decides to come up with an entirely new methodology based upon data never before mentioned by anybody in their final determination, might that be a circumstance where exhaustion might not be required? In that case, too, the same question would apply. The question would be was this issue squarely in play? Did the parties have a reasonable opportunity to address this? And I don't hear my colleagues saying that they had no notice or they had no opportunity to address. One of them did address the Columbia data. They just didn't come up with the new argument that they did it for the first time at CIT. Precisely. So this case is a great example where the issue was squarely in play. And as Your Honor suggests, there may be other cases if there were hundreds and hundreds of potential options where that may not be true, but it certainly is true here. Do you agree that Commerce never actually considered the issue now being asked for us to consider and that the CIT actually considered? We agree to the extent that there's nothing in the record where Commerce writes out its analysis, but we cite a case, National Association of Mirror Manufacturers, which is cited in the SAA, the Statement of Administrative Action, where what that case says is that it's applying to a commission determination, but absent some showing to the contrary, the commission is presumed to have considered all the evidence on the record. How is that consistent with your position in your CIT briefing on page A136 where you specifically say that plaintiffs defried Commerce of the opportunity to consider this issue? So that was related to our failure to exhaust argument, and I can see how the court would think that there's an inconsistency, but I'd like to briefly describe a little bit of procedural history that might clarify. So before the CIT, the plaintiff's only argument regarding collapsing was that Commerce made the wrong decision on the merits, and the CIT sets that out in pages 7 to 8 and 13 to 14 of its decision, and the CIT itself understood the plaintiffs to be arguing that Commerce had implicitly considered the issue. So those were the issues at play, and we were arguing that the plaintiffs not only failed to give Commerce the opportunity to consider this, but failed to give Commerce the opportunity to write up its analysis in support of its decision. And so those were the issues before the CIT. Before the CIT, they didn't... So you see a distinction between inherently considering it and actually writing about it. Yes, and I'd like to point out one last thing. I see my time has almost elapsed. But the regulation on collapsing, which the plaintiffs point out, it says that when Commerce will collapse. But the important thing here is that it says the key criteria is when, quote, the secretary finds that there is a significant potential for manipulation of price or production. And so that trigger has not occurred here of the secretary finding, and that indicates discretion in Commerce. So simply because Commerce did not write out its collapsing determination, there's no indication that Commerce thought that there was any significant potential for manipulation of price or production here. Can I just ask you a procedural question? I know you're out of time, but if we agree with you on exhaustion, what do we do? Do we affirm the CIT on different grounds, or do we conclude there was legal error in the exhaustion decision and send it back for a decision consistent with our decision? The best reasoning, we believe, would be to affirm on other grounds because the only reason that the CIT provided was this change between the preliminary and the final. And so it's appropriate for this court to resolve that as a matter of law and end the inquiry there. But did your friends on the other side raise any other challenges to Commerce's determination apart from the newly raised argument that would have to be resolved? No, Your Honor. I mean, I can ask them that, but okay. No, Your Honor, I don't believe so. Okay. Thank you. May it please the Court. I'm Nancy Noonan from the law firm of Arendt-Fox. On behalf of Jubail Energy Services and Duferco S.A., for short, we call them collectively JESCO. Just to briefly revisit the notice issue, again, as the Court is aware, the third country data for JESCO was placed on the record almost eight months before the preliminary determination was issued. And the parties had plenty of opportunity to make comments because at that point they didn't even know what Commerce would be doing with that third country data. So the parties had plenty of opportunity to raise a collapsing issue if they thought there was one to be raised. Second, on the issue of whether constructed value profit was in play and should have been, the parties were aware that they needed to exhaust their remedies, I'll just point out that the Department of Commerce itself, sua sponte, after the preliminary determination, placed on the administrative record that Tanaris, a financial statement, which was one of the options that was considered. So, again, on May 9th, 2014, Commerce itself places this on the record solely for the purpose of constructed value, and the parties had the opportunity to provide more comments then about whether the Tanaris statement should be used, whether something else should be used. Was that before the final determination? Yes, ma'am. Yes, Your Honor. And then, finally, in our case brief, yes, it was only a half page, but that half page included the actual calculation that JESCO was providing that should be used for C.V. profit. So the parties were aware of the impact using this C.V. profit rate would have on the margin, and we also provided an exhibit showing how that was calculated. So, you know, I believe that there was plenty of notice in the case brief that parties could have rebutted if they were so inclined. So, from our perspective, though, this case is about Commerce's calculation of constructed value profit. This is an important issue which Commerce did carefully consider. All of the parties agree Commerce was required to base constructed value profit on, quote, any other reasonable method. The applicable statutory provision does not reference any sort of minimum profit that must be used, but it does reference a cap on profit if a cap can be calculated. So it gives the Department of Commerce wide discretion on how to calculate C.V. profit, and that should be decided on a case-by-case basis. And while it is our position that the sales that were used were in the ordinary course of trade, the statutory provision that was applied does not even reference sales in the ordinary course of trade. So even with the affiliation, even with collapsing, it may be that Commerce in its discretion could still use these sales, which would make this issue actually moot about whether the collapsing analysis should have been conducted. In reviewing the data on the record, Commerce specifically determined that JESCO's third-country sales to Columbia were the best available option for determining C.V. profit. Commerce specifically found the sales met all the requirements for C.V. profit set out under the preferred method. Can you address real quickly what your opponents argue, and that's that Commerce was required by law to conduct a single-entity analysis here. I mean, you're arguing that the use of these third-country sales was reasonable. They're arguing that you don't get there because Commerce should have, required by law, to have collapsed those sales into the single entity. Sure, Your Honor. It's our position that Commerce was not required to conduct such an analysis. One, the affiliation alone does not automatically trigger in every case a discussion of collapsing. There's plenty of cases out there where there are affiliated party transactions and Commerce doesn't spend, does not put anything in the decision. Is that requirement limited to normal value in looking at the affiliation of domestic companies, or does it also extend to the export sales? I think it extends to any time Commerce is going to use some sort of transaction or data that was between two affiliated companies. In this case, we did use sales to the affiliate. They were above cost. But here Commerce did engage in a single-entity collapse. Right, yes. They ultimately decide to use what's clearly on the record an affiliated company, sales to that affiliated company. Why wouldn't Commerce say we need to also collapse this into the single entity? I mean, they already did that with a number of companies. Right. Well, Your Honor, those other companies were, in fact, 100% owned by the parent company at issue. This affiliate in Columbia was not 100% owned. There were some other companies that owned the company as well. But there's not a 100% requirement. Is there? No, there is not, Your Honor. But it does show a distinction in this case amongst these companies as to why they were not on all fours exactly the same and therefore should be treated the same. And we feel there was no evidence of significant potential for price manipulation. And, of course, the affiliated reseller was not actually a producer. Why is there no potential for price manipulation? These are affiliated companies. Well, we think, Your Honor, because of the not as much ownership as there is when there's 100% ownership in those other companies that were collapsed. This ownership was a little bit over 50%. Fifty? Yes, still majority owned. But, again, you've got other factors in play. And the regulation on collapsing instructs commerce to be looking at level of common ownership, whether there's managerial employees and board employees that are sitting on both. You're out of time, but let me ask you this last question. Did commerce conduct an arm's length transaction analysis with respect to the sales to Columbia? Yes, Your Honor, and also a below sales test. And am I correct to reject some of those sales because they were not at arm's length? Yes, they did. Sharon, I'm going to restore you back to three minutes since we took you over. Thank you, Your Honor. Just a few quick points in rebuttal. Can you start with the last question I asked to the government, what you think we should do if we disagree with the trial court's exhaustion analysis? Can we just affirm, or are there issues you think that need to be addressed on remand? There's only one issue in this case, whether they need to do a collapsing analysis. Okay, so if we disagree and find that you failed to exhaust that, then we can disaffirm it. Correct. Okay. But, Your Honors, here the court should not do that, and that's because in response to your earlier question, Judge Hughes, you know, where commerce changes their methodologies in the final, they do do it all the time. The key is that they do it in accordance with law. And here, clearly, under the statute, the regulation, their past practice, finding you have transactions between affiliated parties and then not doing a collapsing analysis is arbitrary and capricious. Here, as Judge Reina said, even though this information was placed on the record at the beginning of the case, there was no verification of any Columbian data. Verification takes place prior to briefing. So there's no reason for us to believe that commerce would use the respondents' Columbian data when they didn't even bother to verify it. Did you ask for verification? We did not. I mean, verification takes place in all investigations. Did you file verification comments? Yes, we did. Pre-verification comments? We did file pre-verification comments. And you didn't ask for verification on those? We did just as a Saudi and U.S. issues. And commerce often does make changes between its prelim and final and does either amended preliminaries or it serves notice to parties via letter and says, we're considering a change. We invite further comment. We just did in the case two weeks ago in an administrative review. So that happens quite often. Finally, just as the exhaustion issue, we did find one case on point here. It was mentioned Korrestal. And we would note in that CFC case from 2007 where this court found that Korrest had failed to exhaust its remedies, it said, and I quote, this is not a case, for example, in which the private party was denied access to critical information prior to the time its case briefer was due or in which the agency changed its position. Here, the agency did change its position. Right, I know that issue. You can't take that statement out of context and say that every time the agency changes its position, you're excused from exhaustion. Not only where it is a fundamentally required... Where you were denied critical information. And you were not denied any critical information here. It was all on the record and it was being argued as a basis for calculations. Not only. This court said, or the agency change its position. And here, the agency made a radical change in its position and it acted arbitrarily and cautiously. I'm sorry. Don't overstate the record. They didn't make a radical change in their position. They didn't change the methodology, except instead of relying on one set of data for profits, they used another set of data for profits. They didn't go from actual value to a constructed value or from non-adverse facts to adverse facts. They changed profit data that you were on notice, was in the record, and was in fact being urged to be used by commerce, by your opponents. But to me, the radical change is they used profit data from related parties that should have been collapsed. Okay. And we think you should send that back to the department. Thank you, Your Honor. Two minutes. Thank you very much, Your Honor. I just want to quickly address some of the points besides exhaustion. I understand the court has expressed certain views about exhaustion, but quickly I just want to point out some other things in response to what counsel raised during their argument. The first is that this really isn't an extremely important issue. This is a dispositive issue. It could swing commerce 180 degrees between not issuing anti-dumping duties and issuing anti-dumping duties, if commerce had considered this collapsing analysis and undertaken it. With respect to the particular evidence of the need for collapse... If it's that important, why didn't you raise it? Well, you know, going back to the exhaustion... I mean, you've made no argument to me, or at least no satisfactory argument, that you were unable to raise this, that you were unaware of it, that if you had exercised due diligence, that you couldn't have raised it. If it was that important, then you should have told commerce that so that we could have a reasoned determination from them to rule on. We might very well agree with you. I understand your position, Your Honor. The best I can say to that is what I said before, which I understand you may not agree with, which is that the parties were completely focused on other issues, that all of the briefing... Not all of the briefing. 99% of the briefing was focused on other methods of calculating C.V. profit. All of the hearing was focused on other methods of calculating C.V. profit. And we think, you know, it is an important issue that... an important concern that you don't want parties larding their briefs with arguments that may not be necessary. And if you start saying, any time you fail to raise an issue that commerce hasn't given you notice is relevant to the proceedings, that's going to be exhaustion, and parties are going to have to start adding all sorts of arguments into their briefs. And I don't think that would be beneficial. Are you saying that any time your adversary raises an issue, you'll have to respond to it? Is that what you're saying? Because that's what the issue is. It was a small issue, I guess. You're saying it's just half a page. It's one of many arguments made. And so you didn't respond. I would think we would not be able to make the argument we're making today if this was the key focus of Jessica's brief. If they had spent the bulk of their brief, the focus of the brief, it was one of their prime arguments. But it was an afterthought on the last page of their discussion of C.B. Profitt that they didn't give any real credence to, that was not raised by them at the hearing, that commerce never asked about. There was just no thought whatsoever to the people acting on the ground that this was a relevant issue that needed to be... Now, you're talking about the hearing. I'm sorry. Go ahead. You're talking about the hearing. I don't know. Where does that take place in the process? Is that after you've... That's after the briefing. That's correct, Your Honor. So how would you know at that point? How does relying on that help when the time for you to respond to it would have been in your brief? Well, Your Honor, I would think something like if commerce was asking lots of questions at the hearing, because the whole point of the hearing is for commerce to consider the arguments of the parties. If it was suggesting, hey, this is a way we might go, then counsel could have raised their issues and they could have suggested maybe post-hearing briefing on this particular issue would be appropriate because we think there are some issues that... some potential problems with this data that haven't been properly fleshed out. So that's what we would suggest. Is that my time? Okay. Thank you very much.